The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Garner. The appealing party has shown good grounds to reconsider the evidence. Accordingly, the Full Commission reverses the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to the Workers Compensation Act.
2. The injury that is the subject of this hearing occurred on January 26, 1999.
3. The employer-employee relationship existed on January 26, 1999.
4. The employer was self-insured on January 26, 1999.
5. Plaintiffs average weekly wage on January 26, 1999 was $911.47.
6. Plaintiff has been out of work from July 9, 1999 to present. Plaintiff received short-term disability from October 15, 1999 to present. Plaintiff has not received unemployment benefits.
7. The depositions of Lewis Stocks, M.D. and Cara L. Davis, M.D. and plaintiffs medical records are a part of the evidentiary record in this matter.
 ***********
Based upon all of the evidence of record, the Full Commission finds as follows
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was a 37-year-old registered nurse (RN) who had been employed with Raleigh Community Hospital, a Duke University Health System facility, since February 1992.
2. Plaintiff had undergone several hernia repairs prior to January 1999. However, on January 26, 1999, plaintiff was asymptomatic and working without restrictions at which time she was assigned to the facility's operating room.
3. Plaintiff usually performed the duties of a scrub nurse, a circulating nurse or a unit coordinator. On January 26, 1999, plaintiff was performing the duties of a circulating nurse which included making sure that all sterile personnel have the necessary supplies, getting the patient into the operating room and assisting with the positioning of the patient. When plaintiff arrived in the operating room, it was set up for Dr. Fukushima, a neurosurgeon specializing in otoneurology. However, plaintiff learned that the surgery would be performed by Dr. McElveen instead. Consequently, the equipment and certain instrumentation were incorrect and would have to be moved. Therefore, plaintiff began to move Dr. Fukushimas equipment including his microscope out of the room while someone else retrieved the appropriate equipment. Dr. Fukushimas microscope which was custom made for him and larger than the other microscopes was in the way. This microscope had a customized scope and a large amount of computerized programming which made it an unusually heavy microscope. Plaintiff had never moved this microscope or any other microscope as large as this one without help. Plaintiff began pushing the microscope to the other side of the room but the microscope was very heavy and presented significant resistance to plaintiffs attempt to move it and her efforts required all of her body weight. While pushing this microscope in an effort to move it, plaintiff experienced pain in her left lower quadrant or groin area.
4. After moving the microscope, the pain subsided somewhat but returned with increased intensity about ten minutes later after another incident. Prior to the surgery by Dr. McElveen, Dr. Fukushima was to perform the lumbar drain for Dr. McElveen before moving to his next case. Dr. Fukushima who is quite impatient was in a hurry to move to his next case. Therefore, Dr. Fukushima wanted plaintiff to position the patient immediately. However, because the patient was already asleep and unable to aid in the positioning, plaintiff knew she would require assistance. Consequently, plaintiff paged a PCA for help positioning the patient. However, the PCA did not arrive in time. A nurse anesthetist, David Ross Armstrong, positioned the patients head and shoulders while plaintiff positioned the rest of the patients body. Dr. Fukushima did not aid in the positioning. Prior to this time, plaintiff had never positioned a patient without help. Furthermore, normally, plaintiff would only position a patients feet rather than the entire lower part of the patients body. On this occasion, plaintiff positioned the entire body below the shoulders. Furthermore, when plaintiff had been required to move the entire trunk and lower part of the body, she had done so only when a patient was awake and could assist with the positioning. As plaintiff was moving the patient under these unusual circumstances, she felt a second pain as she slid the patient back to the edge of the table. Although plaintiffs normal duties include moving microscopes and positioning patients, on this day the totality of the circumstances and the manner in which these duties were performed were of an unusual nature.
5. Plaintiff was required to continue assisting with surgery and holding the patient. A PCA did enter the operating room after the patient was positioned and relieved plaintiff from holding the patient. When plaintiff was able to leave, she reported pain to her supervisor Carol White and filled out an incident report. Thereafter, plaintiff returned to the operating room but her pain became so severe she was sent to the doctor.
6. On January 26, 1999, plaintiff presented to Raleigh Community Hospitals Occupational Health Department with right groin pain and was referred to Dr. Cara Davis of Spectrum Medical Center for treatment. Dr. Davis diagnosed plaintiffs condition as a right inguinal strain and restricted her from bending and lifting more than 10 pounds.
7. On January 27, 1999, plaintiff returned to work with defendant-employer in a light duty position in the operating room where she worked for several months until she was transferred to case management. Plaintiff worked in this capacity until approximately July 9, 1999.
8. Following January 26, 1999, Dr. Davis continued to treat plaintiff conservatively and ordered physical therapy. However, plaintiffs pain continued. Dr. Davis last treated plaintiff on June 14, 1999 at which time Dr. Davis detected a mass or possible neuroma that developed during his treatment.
9. Dr. Davis referred plaintiff to Chris Waters, M.D. who did not feel that plaintiff had a recurrent hernia. Thereafter, plaintiff underwent pain therapy for several months, which was unsuccessful.
10. Thereafter, plaintiff was evaluated by Dr. Waters partner Lewis Stocks, M.D. who diagnosed plaintiff with right inguinal neuroma, which he surgically excised on November 24, 1999. After the surgery, plaintiffs pain improved somewhat. Prior to this treatment, plaintiff had been treated by Dr. Stocks for recurrent right inguinal hernia problems for which she underwent several repairs prior to January 26, 1999. However, plaintiff had been asymptomatic prior to the January 26, 1999 incidents. During the last repair, performed in June of 1997, Dr. Stocks used staples to place a mesh over the area weakened by the previous hernia. According to Dr. Stocks, there was a disruption of the mesh that entrapped an inguinal nerve resulting in the neuroma, plaintiffs most recent complaint. Additionally, due to plaintiffs pre-existing condition and history, she was more susceptible to reinjury.
11. Furthermore, according to Dr. Stocks, plaintiff is experiencing what is known as the "gate theory resulting in her current diagnosis of chronic complex pain syndrome. The chronicity of plaintiffs pain caused her pain to continue even after the excision. Although Dr. Stocks would assess plaintiff currently with a one hundred percent (100%) permanent impairment rating, he feels that the permanent impairment would be less if plaintiff participated in a quality pain management program.
12. As a result of plaintiffs right inguinal neuroma and the associated pain syndrome, plaintiff has been unable to work since July 9, 1999. At the time of the hearing before the Deputy Commissioner, plaintiff was receiving long-term disability benefits through an employer funded disability program.
13. Dr. Davis indicated that plaintiffs development of the neuroma was consistent with the type of strain or trauma plaintiff encountered while moving the microscope. Furthermore, Dr. Stocks believed that plaintiffs inguinal neuroma could have been caused or aggravated by plaintiffs moving the microscope or positioning the patient or both on January 26, 1999. Dr. Stocks also indicated that the chronic complex pain syndrome suffered by plaintiff is a result of the incident or incidents on January 26, 1999. Dr. Stocks opinions are based on plaintiffs history, the period that she was asymptomatic and the timing of the development of the neuroma. Accordingly, the greater weight of the medical evidence of record demonstrates that plaintiffs neuroma, surgery, pain syndrome and resulting inability to work were caused by the work-related incident or incidents of January 26, 1999.
14. On January 26, 1999, plaintiff sustained an interruption of her normal work routine by the introduction of unusual circumstances involving the two incidents when moving the microscope and positioning the patient which resulted in an injury by accident, namely an inguinal neuroma and accompanying pain syndrome, arising out of and in the course and scope of her employment.
15. Although Joan Bruno and Dave Armstrong testified that nothing unusual occurred in the operating room on January 26, 1999 and neither had reason to know of any unusual occurrence with the microscope or patient, the greater weight of the evidence indicates that the nature of the circumstances and events were unusual compared to plaintiffs normal work routine, duties and the manner in which they were usually performed.
16. Plaintiffs average weekly wage at the time of her injury by accident on January 26, 1999 was $911.47 yielding the maximum weekly compensation rate for that year of $560.00.
 ***********
Based upon the foregoing findings of fact, the Full Commission concludes as follows
 CONCLUSIONS OF LAW
1. On January 26, 1999, plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant-employer. G.S. 97-2(6).
2. Therefore, subject to a reasonable attorneys fee and defendants credit for short-term disability paid, plaintiff is entitled to weekly compensation benefits at a rate of $560.00 for total disability beginning July 9, 1999 and continuing until she returns to work at the same or greater wages or until further order of the Commission. G.S. 97-29.
3. As a result, subject to the limitations of G.S. 97-25.1, plaintiff is entitled to all reasonably necessary medical expenses arising out of her injury by accident, which tend to effect a cure, provide relief, or lessen the period of disability. G.S. 97-25.
4. Defendant is entitled to a credit for short-term disability paid beginning October 15, 1999. G.S. 97-42.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
 AWARD
1. Defendant shall pay plaintiff weekly compensation benefits at a rate of $560.00 for total disability beginning July 9, 1999 and continuing until she returns to work at the same or greater wages or until further order of the Commission, subject to a reasonable attorneys fee and defendants credit for short-term disability paid. The accrued amount minus defendants credit shall be paid in one lump sum, subject to an attorneys fee hereinafter approved.
2. Subject to the limitations of G.S. 97-25.1, defendant shall pay all reasonably necessary medical expenses incurred or to be incurred by plaintiff arising out of her injury by accident which tend to effect a cure, provide relief, or lessen the period of disability.
3. A reasonable attorneys fee in the amount of 25% of the weekly compensation due plaintiff is hereby approved for plaintiffs counsel to be deducted from the lump sum due plaintiff and paid directly to plaintiffs counsel and thereafter to be paid by every fourth check.
4. Defendant shall pay the costs due the Commission.
This the ___ day of July 2001.
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER